821 F.2d 649
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Arnold FROST, Petitioner,
v.
BENEFITS REVIEW BOARD, et al., Respondents.
 No. 85-4034.
 United States Court of Appeals, Sixth Circuit.
 June 26, 1987.
 
 Before KENNEDY and MILBURN, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 This case is before the court on a petition to review a final decision of the Benefits Review Board pursuant to Sec. 21(c) of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. Sec. 921(c), as incorporated by Sec. 422(a) of the Black Lung Benefits Act, 30 U.S.C. Sec. 932(a). The Board upheld an administrative law judge's (ALJ's) decision denying petitioner Arnold Frost's claim for black lung benefits. Frost claims error in the ALJ's findings that his delivery of lunches to coal mine workers did not constitute qualifying coal mine employment and that he failed to establish that his totally disabling respiratory impairment arose from coal mine employment.
 
 I.
 
 2
 On July 10, 1978, Frost filed his claim for black lung benefits pursuant to the Black Lung Benefits Act, 30 U.S.C. Secs. 901 et seq. His claim was denied initially and upon reconsideration by the Department of Labor. On May 27, 1980, Frost requested and was granted a hearing on his claim. That hearing was held before an ALJ on September 23, 1981.
 
 
 3
 Frost was born on December 27, 1916, and was therefore 64 years old at the time of the hearing. He claimed that he first worked in coal mines in 1924, when at the age of eight he started delivering lunches to miners working in a mine owned by his father. Frost explained that at his lunch hour he would come home from school, take a basket of lunches to the mine, crawl down a 30-inch vein to deliver the lunches to the miners, crawl back out the vein, and return to school, usually late. Frost did this for six days a week for four years through 1928. During his deliveries, Frost was usually in the mine between 45 minutes and one hour.
 
 
 4
 In 1928, Frost's duties changed and he began working as a laborer in his father's mine, loading and shooting down coal. He did this for eight years, through 1936, at which time he quit working for his father. He then went to work at another coal mine for two months loading coal. This was his last work in a coal mine.
 
 
 5
 Frost subsequently worked for nine years at a nursery doing landscaping work.[1] Frost next worked in a foundry for 21 years. For the first six years, he loaded and unloaded coal cars and was exposed to coal dust "[e]very day, all day long." Frost then became a "molder" where he was exposed to sand dust for nine years. Frost finished out his time at the foundry in the core room making cores. There was no dust exposure related to this last job.
 
 
 6
 Frost's last work was as a woodworker for approximately six years, from 1970 through February, 1977. At that job, he was exposed to moderate amounts of sawdust. Frost has not worked since retiring from his woodworking job.
 
 
 7
 Frost testified that unless he walked slowly, he would be out of breath and have to sit down if he walked more than half a block. He also stated that he coughs all the time and has smoked one pack of cigarettes daily for the past 56 years.
 
 
 8
 The first medical evidence of record involves his hospitalization in September of 1976, when he was diagnosed as having duodenal ulcer with hemorrhage. On his admission, a tentative diagnosis was "R/O [rule out] silicosis." An x-ray taken during his hospitalization was interpreted as showing "no distinct evidence of active pulmonary pathology."
 
 
 9
 On January 4, 1979, Frost was examined by Dr. Paul Bell. Dr. Bell diagnosed an x-ray taken at that time as showing 0/0 (no) small rounded opacities, but showing "U"-shaped irregular opacities in both lower lung zones. Dr. Bell did not, however, indicate the profusion of the opacities. This x-ray was later reread by Dr. J.F. Wiot, a certified B reader.[2] Dr. Wiot interpreted the x-ray as 0/0 for pneumoconiosis but showing evidence of disc atelectasis at both bases. A ventilatory study also performed by Dr. Bell on January 4th yielded an FEV1 value of 2.1 and an MVV value of 74. Although those values are nonqualifying under the applicable regulations, Dr. Bell opined that the values were consistent with chronic obstructive pulmonary disease of a moderate degree. In his ultimate report, Dr. Bell diagnosed chronic obstructive pulmonary disease, and fibrosis consistent with pneumoconiosis. Dr. Bell also responded "yes" to a form question of whether the diagnosed condition was "related to dust exposure in the patient's coal mining employment." Dr. Bell did not elaborate as to the basis for his conclusion.
 
 
 10
 On May 15, 1979, Frost underwent an arterial blood gas study at Mercy Hospital in Toledo, Ohio. At rest, the test yielded a PCO2 value of 36.3 and a PO2 value of 72.6. After exercise, PCO2 was 36.3 and PO2 was 79.0.
 
 
 11
 On June 19, 1979, Frost completed a ventilatory study and a blood gas study at the request of Dr. T.J. Williams, his family doctor. The ventilatory study resulted in qualifying values of 1.33 for the FEV1 and 51 for the MVV. However, it was noted that Frost's effort was less than maximum during the study. This observation was confirmed by Dr. Sarah Long, who subsequently reviewed the study at the request of the Department of Labor. Dr. Long concluded that Frost's effort was poor and erratic during the testing. The blood gas test performed on June 19 resulted in a PCO2 value of 25.2 and a PO2 value of 62.4. These are qualifying values under the pertinent regulations.
 
 
 12
 In a letter dated July 16, 1979, Dr. Williams stated that Frost "is and has been totally disabled for sometime because of his Pulmonary Obstructive Disease, a large part of which I feel was the exposure to coal dust." Dr. Williams also completed a questionnaire form at the request of the Department of Labor on August 6, 1979. In it, Dr. Williams responded in the affirmative to questions of whether Frost was unable to engage in coal mine work due to his impairment and whether the impairment could be said "to be caused by, aggravated by, or significantly related to coal mine employment."
 
 
 13
 At the request of the Department of Labor, Dr. Sarah Long reviewed all of the pertinent medical evidence of record and made an independent determination as to Frost's condition. She first opined that Frost did not suffer from a disabling chronic disease of the lung. For support, she cited to the x-ray interpretation by the certified B reader and the nonqualifying values of the ventilatory and blood gas studies. Dr. Long also concluded that the ventilatory study taken on June 19 was not valid, due to Frost's poor effort. Dr. Long further opined that Frost's condition was not related to his coal mine employment. She believed that his extended work in the foundry could account for any respiratory impairment.
 
 
 14
 The ALJ rendered his decision denying benefits on December 2, 1981. The ALJ initially determined that Frost had a total of eight years and two months of qualifying coal mine employment, which included the eight years he worked in his father's mine and the two months he worked immediately thereafter in another mine. The ALJ rejected Frost's claim that the four years he spent delivering lunches qualified as coal mine employment. The ALJ found that the lunch delivery was not reasonably related to either extraction or preparation of coal, even though it involved exposure to coal dust. Since Frost had less than ten years of coal mine employment, and therefore did not qualify under a statutory presumption provision, he had the burden of proving that he was a miner, that he was totally disabled due to pneumoconiosis, and that his pneumoconiosis arose out of coal mine employment.
 
 
 15
 Under this framework, the ALJ first found that the x-ray evidence failed to establish the presence of pneumoconiosis, and therefore a finding of pneumoconiosis could not be made pursuant to 20 C.F.R. Sec. 410.414. Secondly, looking at the blood gas studies, the ALJ observed that the June 19, 1979 test yielded qualifying values under the appendix table referred to in 20 C.F.R. Sec. 410.424. Thus, the ALJ concluded that total disability was demonstrated. Finally, as to the ventilatory studies, the ALJ found that the June 19, 1979 study which yielded qualifying values under 20 C.F.R. Sec. 410.426(b) was not reliable due to Frost's poor and erratic effort.
 
 
 16
 Based on his review of this medical evidence and the opinions of the physicians who had examined Frost or his records, the ALJ concluded that Frost suffered from a disabling respiratory condition. The ALJ rejected the contrary opinion of Dr. Long, since she had not examined or treated Frost and thus her opinion was entitled to less weight. However, the ALJ found, consistent with Dr. Long's conclusion, that Frost had not met his burden of showing that his impairment arose out of his coal mine employment. The ALJ discounted Dr. Bell's response on the questionnaire form that Frost's condition was related to coal mine employment, since Dr. Bell did not address Frost's extensive coal and sand dust exposure at the foundry, the length of Frost's coal mine employment (less than ten years), or Frost's history of smoking. The ALJ also found that Dr. Williams' brief response and review was similarly incomplete. Thus, the ALJ held that the conclusions of Drs. Bell and Williams did not provide sufficient evidence that Frost's impairment arose out of coal mine employment, particularly in light of the lengthy periods of exposure to coal and sand dust during Frost's foundry work, as well as his extensive smoking history.
 
 
 17
 Frost subsequently brought a timely motion for reconsideration, which the ALJ denied on February 3, 1982. The ALJ first rejected Frost's contention that he should be credited with four more years of coal mine employment due to his lunch-carrying duties. The ALJ observed that the claim was fully considered in his first decision, but even if it was assumed that the work qualified as coal mine employment, it was not equivalent to four years since Frost was only in the mine for one hour a day, six days a week. Over a four-year period that would not add up to the amount of time needed to provide Frost with more than ten years of qualified coal mine employment necessary to qualify him for the statutory presumption. As to Frost's claim that the ALJ had set his expertise against opinions of examining physicians, the ALJ stated
 
 
 18
 In claims considered under Part 410 of the regulations, where there is less than 10 years of coal mine employment, the claimant must demonstrate by a preponderance of the evidence that his pneumoconiosis arose from his coal mine employment. My finding essentially was that the Claimant did not carry his burden in this regard and the legal conclusion was reached that the medical evidence did not support such a finding. Contrary to Claimant's contention that the undersigned found that his condition was related to factors other than coal mine employment, it was simply found that the evidence did not show that claimant's pneumoconiosis was due to coal mine employment to the exclusion of the other admitted significant industrial exposures of the Claimant.
 
 
 19
 Frost then sought review with the Benefits Review Board. The Board affirmed the ALJ's decision, and on July 16, 1985, Frost filed a complaint with the district court seeking judicial review of the Board's decision pursuant to 33 U.S.C. Sec. 921(c). That action was subsequently transferred to this court by order of the district court on December 12, 1985.
 
 II.
 
 20
 Our review of decisions of the Benefit Review Board is narrow, and is related to the Board's own limited scope of review of decisions by an ALJ. The Board's review is limited to determining whether the ALJ's findings of fact and conclusions of law are supported by substantial evidence and are in accordance with law; if they are, then the Board may not set them aside. 20 C.F.R. Sec. 802.301. Our review is limited to examining whether the Board adhered to its limited scope of review and made no errors of law. Gibas v. Saginaw Mining Co., 748 F.2d 1112, 1116 (6th Cir.1984), cert. denied, 471 U.S. 1116 (1985). Thus, our focus is also on whether the ALJ's findings and rulings are supported by substantial evidence and the law--the same standard of review utilized by the Board. See Ramey v. Kentland Elkhorn Coal Corp., 755 F.2d 485 (6th Cir.1985); Sun Shipbuilding & Drydock Co. v. McCabe, 593 F.2d 234, 237 (3d Cir.1979).
 
 
 21
 If a miner has ten or more years of qualifying coal mine employment and suffers from pneumoconiosis, it "will be presumed in the absence of persuasive evidence to the contrary, that the pneumoconiosis arose out of such employment." 20 C.F.R. Sec. 410.416(a). On the other hand, if a miner has worked less than ten years in coal mines, he bears the burden of proving that he was a coal miner, that he is totally disabled due to pneumoconiosis,[3] and that it arose out of his coal mine employment. 20 C.F.R. Sec. 410.410(b)(1). In the instant case, the ALJ concluded that Frost had a total of eight years and two months of qualifying coal mine employment, and therefore did not qualify for the presumption provided by Sec. 410.416(a). Frost argues that he has more than ten years of qualifying coal mine employment, due to the four years he spent carrying lunches to mineworkers in his father's mine. He disputes the ALJ's finding that his lunch delivery duties do not qualify as coal mine employment.
 
 
 22
 The Black Lung Benefits Act defines a coal miner as "any individual who works or has worked in or around a coal mine or coal preparation facility in the extraction or preparation of coal. 30 U.S.C. Sec. 902(d). This court has recognized that this statutory definition has two elements, a "situs" requirement--work in or around a coal mine--and a "function" requirement--performance of coal extraction or preparation work. Southard v. Director, OWCP, 732 F.2d 66, 69 (6th Cir.1984). Since it is undisputed that Frost's lunch-carrying duties inside the mine meet the situs requirement, the sole focus is whether they can be considered coal extraction or preparation work and therefore satisfy the function requirement.
 
 
 23
 The Act defines coal preparation as the "breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or anthracite, and such other work of preparing such coal as is usually done by the operator of the coal mine." 30 U.S.C. Sec. 802(i). In addition, workers performing duties found to be incidental to these tasks have met the function requirement and have been considered to be engaged in coal mine employment. For example, in Amigo Smokeless Coal Co. v. Director, OWCP, 642 F.2d 68 (4th Cir.1981), the Fourth Circuit upheld the Board's finding that a coal mine laboratory technician met the function test and was therefore a miner under the Act. The court found that a factual basis supported the Board's determination, since the evidence showed that "knowledge of the chemical composition and energy content of the coal was a necessary step in ... preparation of the coal for sale." Id. at 70-71. Similarly, in Freeman v. Califano, 600 F.2d 1057, 1060 (5th Cir.1979), the Fifth Circuit held that a claimant's work on railroad track at a coal mine which facilitated the transportation of coal was "ancillary activity necessary to the extraction and preparation of coal" and therefore qualified as mining work. See also Adelsberger v. Mathews, 543 F.2d 82, 84-85 (7th Cir.1976) (per curiam) (mine clerical worker who directed the switching of grates and of railroad cars, who determined what "kind of coal" was prepared and to whom it was shipped, and who was responsible for all coal weighing, qualified as a miner under the Act since she worked as an intermediary between steps in the coal-mining operation); Roberts v. Weinberger, 527 F.2d 600, 602 (4th Cir.1975) (mine truck driver's function of hauling coal from extraction site to processing area was part of the process of extracting and processing coal, and therefore was qualifying coal mine employment, since the coal was not yet prepared until it was taken to the processing area); Skipper v. Mathews, 448 F.Supp. 300 (M.D.Pa.1977) (repairing of equipment covered with coal dust by a mine mechanic was part of the coal-mining process, and therefore qualified as coal mine employment, since the coal could not be extracted without properly-functioning equipment).
 
 
 24
 Frost claims that his case is analogous to these previous cases where work incidental to preparation or extraction of coal was found to meet the function test. He asserts that providing lunches to miners assisted in the preparation and extraction of coal by providing nourishment necessary to keep the miners working. We think that this case is distinguishable from the above-cited cases and conclude that the ALJ's finding that Frost's lunch-delivery duties do not qualify as coal mine employment is founded in fact and law. Frost's duties were not incidental to the extraction or preparation of coal in the sense that they were an integral part of the coal-producing process. While the mineworkers obviously had to eat, and it was convenient to have someone bring the lunches to the workers, it was not necessary to have the lunches delivered into the mine. This case is simply not like the above cases, where the incidental duties were more closely related and necessary to the actual process of extracting or preparing coal. Frost's duties were too far removed from the extraction or preparation process to be considered qualifying coal mine employment.
 
 
 25
 Furthermore, even if we were to conclude that Frost's delivery duties meet the function test and therefore constitute coal mine employment, we would still uphold the ALJ's finding that Frost has not established ten years of qualifying coal mine employment. Frost testified that he was in the mine at most for one hour per day, six days a week, for four years. Assuming that the miners worked an eight-hour work day for six days a week, Frost's actual time spent in the mine would be equivalent to only about 26 work weeks, or approximately one-half year. This is far short of the one year and ten months necessary to provide Frost with ten years of qualifying employment. Thus, even if we accepted Frost's argument that delivering lunches to the coal miners constituted coal mine employment, he would still not qualify for the statutory presumption provided by 20 C.F.R. Sec. 410.416(a), and would still bear the burden of proving that he was totally disabled due to pneumoconiosis which arose out of coal mine employment.
 
 
 26
 As his second claim on appeal, Frost challenges the ALJ's determination that he failed to prove that his totally disabling respiratory impairment arose out of his coal mine employment. Frost particularly disputes the ALJ's discounting of the conclusions of Drs. Bell and Williams.
 
 
 27
 Since we find support for the ALJ's conclusion that Frost has less than ten years of qualifying coal mine employment, it necessarily follows that Frost bears the burden of proving every element of entitlement to benefits, including establishing that his respiratory impairment arose from his coal mine employment. 20 C.F.R. 410.410(b)(1); Hon v. Director, OWCP, 699 F.2d 441, 444 (8th Cir.1983). Although Frost submitted the reports of Drs. Bell and Williams, containing their conclusions that Frost's condition was related to his coal mining work, the ALJ found that Frost did not meet this burden. The ALJ was unpersuaded by the doctors' conclusions because neither doctor addressed the effect of Frost's exposure to coal dust for six years at the foundry, Frost's exposure to sand dust for nine years at the foundry, or Frost's fifty-six year smoking habit. Thus, the doctors' responses were incomplete. Given Frost's extensive exposure to nonqualifying conditions which could have created his respiratory impairment, the ALJ concluded that the doctors' mere conclusions were not sufficient to establish a causal connection between Frost's qualifying coal mine work and his impairment. This analysis is entirely reasonable in light of the record on the whole in this case. The question is not, as Frost would have it, whether there is any evidence that his foundry work or smoking habit caused his respiratory impairment; the question is whether Frost presented sufficient evidence proving that his impairment arose from coal mining employment as opposed to other nonqualifying employment. The ALJ concluded that he did not, and we find this conclusion to be reasonable and supported by substantial evidence. We therefore find no basis to overturn the ALJ's conclusion that Frost is not eligible for black lung benefits.
 
 
 28
 Accordingly, we AFFIRM the Board's decision upholding the ALJ's denial of benefits.
 
 
 
 [1]
 Although Frost testified at the ALJ hearing that he worked fifteen years at the nursery, he had designated a nine-year period in his employment history data sheet, from 1937 through 1946. This nine-year period coincides with his other work history, since he claimed he next worked in a foundry for 21 years beginning in 1946
 
 
 [2]
 B readers are certified by the Public Health Service. They have greater qualifications than certified A readers. See Couch v. Secretary of HHS, 774 F.2d 163, 164 n. 1 (6th Cir.1985)
 
 
 [3]
 A finding of the existence of pneumoconiosis through use of x-ray evidence, biopsy or autopsy, will support a finding of total disability due to pneumoconiosis. 20 C.F.R. 410.414(a). A claimant can also establish total disability due to pneumoconiosis if other relevant evidence (1) shows the existence of a "totally disabling chronic respiratory or pulmonary impairment," and (2) establishes that the impairment arose out of employment in a coal mine. 20 C.F.R. Sec. 410.414(c). The ALJ in the instant case determined that Frost's x-ray evidence failed to show the existence of pneumoconiosis. Therefore, the ALJ looked to "other relevant evidence" and found that the blood gas study of June 19, 1979, demonstrated the existence of a totally disabling respiratory impairment. The ALJ did not find that Frost was totally disabled due to pneumoconiosis, however, since he concluded that Frost failed to prove that his impairment arose out of his coal mine employment